IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KEEFE JOHN, *on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>DELTA DEFENSE, LLC and UNITED STATES CONCEALED CARRY ASSOCIATION, INC.,<br><br>Defendants. | Case No. 23-CV-1253<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT, 18 U.S.C. § 2710** |

**CLASS ACTION COMPLAINT**

Plaintiff Keefe John ("Plaintiff") brings this class action lawsuit in his individual capacity and on behalf of all others similarly situated against Delta Defense, LLC ("Delta Defense") and the United States Concealed Carry Association, Inc. ("USCCA" and with Delta Defense, "Defendants") and alleges, upon personal knowledge as to his own actions, his counsel's investigation and upon information and good faith belief as to all other matters, as follows:

**INTRODUCTION**

1. This is a consumer privacy class action lawsuit against Delta Defense and the USCCA for disclosing their digital subscribers' identities and video-viewing preferences—without their consent—to Meta Platforms Inc. ("Meta"), which owns the social networking website and app Facebook, in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA" or "the Act").

2. Operating through Delta Defense, the USCCA is a membership-based organization which aggressively markets and sells access to videos that provide "three tiers of education and legal protection." As detailed herein, those tiers are sold at increasing price points

1

and give purchasers greater access to digital videos about various gun-related topics.

3. On their Website www.usconcealedcarry.com (the "Website"), Defendants offer a vast array of video content; for instance, when a user navigates to the webpage https://academy.usconcealedcarry.com/videos, they are required to create an account in order to view *any* video; that account creation page requires the user to provide personal identifying information including (i) first name, (ii) last name, (iii) email, and (iv) mobile phone (collectively, "Personal Information" or "PII"). That is, to access and to view videos, Plaintiff first had to provide both his Personal Information and to pay the membership fee.

4. As detailed herein, Defendants made the decision to employ tracking technologies (namely, pixels) to collect and to share with third parties, such as Facebook, the viewing information of its subscribers without obtaining informed, stand-alone consent as is required by the VPPA.

5. In so doing, Defendants violated the VPPA, which prohibits "video tape service providers," such as Defendants, from knowingly disclosing consumers' PII, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," unless the consumer expressly consented to the disclosures in a standalone consent form. Accordingly, Plaintiff, on behalf of a class of similarly situated users, asserts a claim for violations of the VPPA and seeks all appropriate relief including, but not limited to, statutory damages in an amount not less than $2,500 for each disclosure of PII, punitive damages and attorneys' fees and costs.

2

Case 2:23-cv-01253-LA     Filed 09/21/23     Page 2 of 18     Document 1

## PARTIES

6. Plaintiff Keefe John is a citizen and resident of Jackson, Wisconsin, where he has resided at all times relevant hereto. Mr. John intends to reside in Jackson, Wisconsin indefinitely.

7. Mr. John used his internet-connected device and web-browsing software installed on that device to visit and to watch video content on Defendants' Website during the Class Period.

8. Defendant Delta Defense is a Wisconsin Limited Liability Company with a business address of 1000 Freedom Way in West Bend, Wisconsin 53095-4945. Delta Defense is the operating company of the USCCA, and provides sales, marketing, operations, and administrative support services to the USCCA and is a licensed insurance agency in all fifty states and the District of Columbia.[1]

9. USCCA is a State of South Carolina non-profit corporation having a principal place of business address at 38 Broad Street, Suite 200 in Charleston, South Carolina 29401.

## JURISDICTION & VENUE

10. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiff's claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

11. This Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because this lawsuit is a proposed class action in which: (i) there are at least 100 Class members; (ii) the combined claims of class members exceed $5,000,000, exclusive of interest, attorneys' fees and costs and (iii) Defendants and at least one class member are domiciled in different states.

12. This Court has personal jurisdiction over Defendants because (i) Delta Defense has its principal place of business within this District and (ii) they have sufficient minimum contacts in Wisconsin to render the exercise of jurisdiction by this Court proper and necessary.

---

[1] https://www.usconcealedcarry.com/about/ (last visited September 20, 2023).

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, and Delta Defense's principal place of business is located here, and both Defendants have considerable business presence in this judicial district.

**COMMON FACTUAL ALLEGATIONS**

*A.     Defendants' Business & Membership Tiers.*

14. Delta Defense is in the business of sales and marketing of self-defense education and firearms training videos to potential members of the USCCA.

15. The USCCA, through its operating company Delta Defense, is a membership-based organization which offer "three tiers of education and legal protection" through various videos accessible on their Website:

> **1  Join the USCCA in Just Minutes**
> Choose from 3 convenient levels and the moment you join you'll become a member of the fastest-growing community of responsible gun owners.
>
> **2  Begin Your Virtual Training Instantly**
> As soon as you join, you have access to the Protector Academy. This secure, online platform is designed to make training from your home easy and affordable. With videos guided by self-defense experts, legal professionals and skilled marksman, you'll be able to react quickly and accurately *when it matters most.*

16. Defendants' lowest priced membership option is their "Gold tier," which is sold for $29.00 per month, or $299.00 for an annual membership.

17. Consumers who purchase the Gold tier membership option receive, among other things, more than fifty-three (53) video series episodes.

18. Defendants describe their membership services as "just like your favorite

streaming service, but with hundreds of self-defense and firearms training videos on demand like *When to Use Deadly Force* and *Situational Awareness*."

19. Defendants' "Platinum tier" is marketed and sold for $39.00 per month or $399.00 for an annual membership and includes all of the items contained in the Gold tier, but the number of video series episodes is increased from 53 to more than 145.

20. The Platinum tier also includes additional video content such as its "Ask an Attorney" video series described as "the most important self-defense questions answered by an award-winning criminal defense attorney."

21. Defendants' most comprehensive (and expensive) membership option is their "Elite tier," which is sold for $49.00 per month or $499.00 for an annual membership and increases the number of video series episodes from 145 (in the Platinum tier) to more than 318.

22. Like the Platinum tier the Elite tier includes additional video content such as its "Ask an Attorney" video series and it also provides access to the "Ask an Attorney" complete archive which is marketed as "access to all the past 'Ask an Attorney' videos to increase your legal preparation."

23. Defendants try to create a false sense of urgency to compel visitors to the Website to sign up and to pay for a membership:

> **Start Your USCCA Membership Today and Get These FREE Bonuses:**
>
> Hurry! Offer ends soon...
>
> 12 HRS | 19 MINS | 53 SECS

24. On information and good faith belief, the "offer" does not end soon or, frankly,

ever.

25. Defendants offer a vast array of video content; when a user navigates to the Website, they are presented with the option to "Join" by creating an account under one of the membership options.

26. The account creation page requires the user to provide a considerable amount of personal identifying information including (i) first name, (ii) last name, (iii) address, (iv) email and (v) mobile phone.

27. Defendants state that there are at least 788,623 members and Tim Schmidt, USCCA's Chairman & Co-Founder, has publicly stated his intention to achieve 1,000,000 members in the near term.[2]

### B. *Defendants Use Pixels to Transmit Users' Video Viewing Histories to Facebook.*

28. Once a consumer, such as Plaintiff, creates an account with the USCCA by providing PII and paying the membership fee, they are then able to view prerecorded audiovisual content from Defendants.

29. While Plaintiff and Class members were viewing prerecorded video content on Defendants' website, Defendants transmitted their viewing choices to Meta.

30. Defendants' transmission of viewing information to Meta included the specific names of video content viewed by users as well as the user's unique Facebook ID ("FID"), a string of numbers unique to each Facebook profile that personally identifies the user.

31. Just as Meta can easily identify any individual on its Facebook platform with only their unique FID so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website.[3]

---

[2] https://www.usconcealedcarry.com/ (last visited September 20, 2023).

[3] https://www.facebook.com/help/211813265517027 (last visited September 20, 2023).

32. For example, when a video is accessed on Defendants' Website, the name and viewer's FID, which is represented by the "c_user" cookie, are sent to Meta.[4]

33. For example, if a subscriber clicks on one of the videos such as "When to Use Deadly Force," that event gets shares with Facebook, along with the user's FID in the c_user cookie value which links the user to their unique Facebook account:



34. Additionally, Defendants track every step of users' activity on the Website.

35. As an example, if a user stops watching a video but comes back to resume it, Defendants track that as well, by capturing the inner text of the buttons the user is clicking:

---

[4] The "c_user" cookie that is transmitted contains the viewer's unencrypted FID.



36. Thus, equipped with an FID and the video content name and URL—all of which Defendants knowingly provide to Meta without necessary standalone consent from its subscribers—any ordinary person could determine the identity of Defendants' subscribers and the specific video or media content they viewed on Defendants' website.

37. Defendants transmit the FID and video titles to Meta in a single transmission, through an invisible tracking tool called a "Meta Pixel."

38. A Meta Pixel is a snippet of a programming code that—once installed on a webpage—sends information to Meta. This transmission occurs when a user views a prerecorded video on Defendants' website.

39. The Pixel is an advertising tool that allows website owners to track visitor actions on their websites for purposes of sending the corresponding information to Meta; websites use the Pixel in hopes of better targeting their products and services on Facebook to interested consumers.

40. Thus, a business such as Defendants chooses to install the Pixel on its website to

8

increase its profits.

41. According to Meta, the Pixel allows it "to match your website visitors to their respective Facebook User accounts" and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[5]

42. Defendants knew that by installing the Pixel on their Website, the Pixel would send Meta information identifying its users and their video-watching habits.

43. Meta explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website[.]"[6]

44. Defendants therefore made a conscious and intentional choice to install the Pixel on their Website to share their subscribers' video viewing histories with Meta for marketing purposes in violation of the VPPA and Wisconsin state law.

45. Further demonstrating that Defendants knowingly placed the Pixel in their Website code, Meta's website states that "[d]evelopers and marketers can *optionally choose* to send information about" a visitor's activity on its website.[7]

46. Meta benefits from websites like Defendants installing its Pixel; when the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook and/or other Meta-owned platforms like Instagram.

47. In addition, even if the business does not advertise with Facebook, the Pixel assists

---

[5] https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited September 20, 2023).

[6] https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited September 20, 2023).

[7] https://developers.facebook.com/docs/meta-pixel/ (last visited September 20, 2023).

Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads.

48. Using the Meta Pixel likewise benefits Defendants' business by improving its ability to promote its content and services to its users.

49. Through use of the Meta Pixel, Defendants disclose to Meta the full name of each video a user watched, together with the user's FID thus linking users' viewing content choices and preferences to their Facebook profiles.[8]

50. Defendants violate and invade the privacy rights of users with their practice of sending their users' FIDs, together with their viewing content, to Meta.

51. Plaintiff and Class members neither knew of nor authorized, nor otherwise consented to, Defendants' disclosure of their prerecorded video and video-services requests and their identities to Meta.

52. As a result, Defendants violate the VPPA by disclosing this information to Meta.

## C. Defendants Do Not Disclose Their Use of the Meta Pixel.

53. The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710.

54. At no point was Plaintiff provided a standalone consent form disclosing Defendants' practices at issue and requesting user consent.

55. Hence, no user knew of or consented to Defendants' offending practice of sharing video preferences with third parties.

## D. Plaintiff & the Class Were Harmed by Defendants' Privacy Invasions.

56. Defendants shared with Meta the personal information of Plaintiff and Class members, including their video viewing histories and associated FIDs, which they reasonably

---

[8] In other words, this single transmission connects a user's video content with their FID.

expected would be kept private.

57. The personal information Defendants obtained from Plaintiff and Class members constitutes valuable data in the digital advertising-related market for consumer information.

58. Defendants' wrongful acquisition and use of their personal, private information deprived Plaintiff and Class members of control over that information and prevented them from realizing its full value for themselves.

59. Defendants' conduct caused economic harm to Plaintiff and Class members whose personal identifiable information diminished in value when Defendants made this information available to Meta.

60. The harms described above are aggravated by Defendants' continued retention and commercial use of Plaintiff's and Class members' personally identifiable information, including their private video viewing histories.

61. The relationship between Plaintiff and other subscribers to Defendants was and continues to be substantial in that it involved creating a paid account, which committed subscribers to an ongoing, financial relationships with Defendants.

62. The subscribers' status as paid users was a necessary condition for accessing the videos on the Website. On information and good faith belief, non-subscribers were prohibited from viewing the videos as that benefit was reserved for paid subscribers.

63. The subscribers actively provided personal identifiable information and money in exchange for a subscription to specific, otherwise restricted video content, which Defendants provided in an ongoing and recurrent fashion, as defined by the various membership tiers. Subscribers paid, registered, committed and associated with Defendants in exchange for the delivery of and access to restricted video content.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS

64. Plaintiff John is a Gold Tier subscriber and a Facebook user.

65. Mr. John has maintained a USCCA membership and account since at least July 2023 and is thus a subscriber to Defendants' services.

66. Mr. John provided Defendants with his personally identifiable information, including at least his first and last name, email address and mobile phone number, when subscribing to their services.

67. Mr. John's Facebook profile includes his name and other personal details.

68. Mr. John watches prerecorded video content on Defendants regularly.

69. Mr. John visited Defendants' Website to request and watch prerecorded video content using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook.

70. Mr. John also uses the same device to request and watch prerecorded videos on Defendants that he uses for Facebook.

71. Mr. John has been served targeted advertisements announcing the commercial availability of Defendants' goods and services on Facebook after watching related videos on their Website.

## CLASS ACTION ALLEGATIONS

72. Plaintiff brings this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representative of the Class preliminarily defined as:

> **Nationwide Class**: All persons in the United States who have a Facebook account, subscribed to Defendants' Website and viewed prerecorded video content on Defendants' Website during the time Meta's Pixel was active on Defendants' Website.

73. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members

of their immediate families, and Plaintiff's counsel. Plaintiff reserves the right to modify, change or expand the Class definition based upon discovery and further investigation.

74. **Numerosity**: The Class consists of hundreds of thousands of individuals making joinder wholly impractical.

75. **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include:

   a. Whether Defendants' use of the Meta Pixel to capture and to disclose Plaintiff's and Class Members' video viewing history was without user consent or authorization;

   b. Whether Defendants obtained and shared or caused to be obtained and shared Plaintiff's and Class Members' PII through tracking using Meta Pixel, which Defendants installed on their webpages;

   c. Whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

   d. Whether Defendants' acquisition and transmission of Plaintiff's and Class Members' personal information resulted in harm and

   e. Whether Defendants should be enjoined from engaging in such conduct in the future.

76. **Typicality**: Plaintiff's claims are typical of the claims of the Class members in that Plaintiff, like all Class members, has been injured by Defendants' misconduct at issue—i.e., disclosing users' PII and viewing content to Meta without appropriate consent.

77. **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiff does not have any interests antagonistic to those of the Class.

78. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Defendants

13

to comply with applicable law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Defendants' financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

79. **Injunctive relief**: Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTE OF LIMITATIONS

80. All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment of the facts alleged herein. Plaintiff and Class members could not have reasonably discovered Defendants' practices of sharing their personal viewing content and PII with Meta until shortly before this class action litigation commenced.

81. Defendants were and remain under a continuing duty to disclose to Plaintiff and Class members their practice of sharing personal viewing content and PII to Meta. As a result of the active concealment by Defendants, all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FIRST CAUSE OF ACTION

### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*
### (*On Behalf of the Nationwide Class*)

82. Plaintiff incorporates and realleges the above factual allegations by reference.

83. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

84. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

85. Defendants are "video tape service providers" as defined in 18 U.S.C. § 2710(a)(4) because they engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiff viewed—through their online platform that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce. Defendants are substantially involved in the conveyance of video content to consumers, profit specifically from that conveyance and Defendants' business is significantly tailored to serve that purpose.

86. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

87. Defendants knowingly caused personal viewing information, including FIDs, concerning Plaintiff and Class members, to be disclosed to Meta.

88. This information constitutes personally identifiable information under 18 U.S.C. §

2710(a)(3) because it identified each plaintiff and Class member to Meta as an individual who viewed Defendants' video content, including the specific prerecorded video materials each such individual watched on Defendants' website.

89. This information allowed Meta to identify each Plaintiff and Class members' specific individual video- viewing preferences and habits.

90. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff is a subscriber to Defendants' services, which provide video content to users on their website, and viewed prerecorded videos provided on Defendants' platform. Hence, Plaintiff is a "consumers" under this definition.

91. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner.

92. Defendants failed to obtain informed, written consent under this definition.

93. Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii).

94. The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election."

95. Defendants failed to provide an opportunity to opt out as required by the Act.

96. Defendants were aware that the disclosures to Meta that were shared through the Pixel identified Plaintiff and Class members. Defendants also knew that Plaintiff's and Class

16

members' personal viewing content was disclosed to Meta because Defendants programmed the Meta Pixel into their website code, knowing that Meta would receive video titles and the subscriber's FID when a user watched a prerecorded video.

97. By knowingly disclosing Plaintiff's and Class members' personal viewing content, Defendants violated Plaintiff's and Class members' statutorily protected right to privacy in their prerecorded video-watching habits. *See* 18 U.S.C. § 2710(c).

98. As a result of the above violations, Defendants are liable to Plaintiff and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A).

99. Under the Act, Defendants are also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendants in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Keefe John, individually and on behalf of all others similarly situated, respectfully requests that this Honorable Court enter judgment in his favor and against Delta Defense, LLC and the United States Concealed Carry Association, Inc. as follows:

- A. Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

- B. Enter judgment in favor of Plaintiff and the Class;

- C. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

- D. Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to

17

which Plaintiff and Class members are entitled;

E. Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F. Award Plaintiff and Class members pre- and post-judgment interest as provided by law;

G. Enter such other orders as may be necessary to restore to Plaintiff and Class members any money and property acquired by Defendant through its wrongful conduct;

H. Award Plaintiff and Class members reasonable litigation expenses and attorneys' fees as permitted by law and

I. Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all issues triable as of right.

Dated: September 20, 2023             Respectfully submitted,

**HANSEN REYNOLDS LLC**

/s/ Timothy M. Hansen
Timothy M. Hansen (SBN 1044430)
Michael C. Lueder (SBN 1039954)
301 N. Broadway, Suite 400
Milwaukee, Wisconsin 53202
(414) 455-7676 (phone)
(414) 273-8476 (fax)
thansen@hansenreynolds.com
mlueder@hansenreynolds.com

/s/ David S. Almeida
**ALMEIDA LAW GROUP LLC**
David S. Almeida (WI Bar # 1086050)
849 W. Webster Avenue
Chicago, Illinois 60614
Phone: 312-576-3024
david@almeidalawgroup.com

*Attorneys for Plaintiff & the Class*